EASTERN DIS.
March, 1833.
<hr>
SHEPHERD
& CO.
vs.
LANFEAR.
For necessary
supplies furnish-
ed a vessel, the
master, the own-
er or freighter,
and the vessel, are
liable, and by
charging either,
the liability of the
others is not de-
stroyed.

---

### SHEPHERD & CO. vs. LANFEAR.

APPEAL FROM THE COURT OF THE FIRST DISTRICT.

A cause will not be remanded, because evidence has been improperly admitted, if on other grounds, the judgment of the inferior court should be sustained.

The acts of a foreign power controling the place where freight is to be delivered, may modify and delay the performance of a contract of charter party.

If the foreign prohibition to land a cargo be conditional, the freighter cannot refuse to receive it, on the ground, that by receiving it, he sustains more inconvenience and expense, than he would sustain if the vessel should perform quarantine, and then land it at the usual place.

If foreign laws change the place of delivery in case of quarantine, the freighter must receive the cargo at the place where the law requires.

EESTERN DIS.
*March*, 1833.

SHEPHERD
& CO.
*vs.*
LANFEAR.

This action was brought by the owners of the ship Shepherdess, against the freighter, for a voyage to Alicant, in Spain, on breaches of a contract of charter party, which is in the following words: *"Memorandum.*—It is agreed between the undersigned, as follows.—That R. D. Shepherd & Co., charter the ship Shepherdess, Cook, master, to Ambrose Lanfear, who taketh the said vessel on charter, *to carry a full and entire cargo of tobacco,* in hogsheads, *from this port of New-Orleans, to Alicant, in Spain,* for the freight of one cent per pound, gross shipping weight, with five per cent. thereon for primage; such freight and primage, to be paid in current specie. The cargo to be furnished on the levee of this city, weather permitting, as fast as the vessel can take it in, and *to be received at Alicant from the tackles of the vessel, at the charterers expense and risk, within twenty-five working days from the time the vessel shall be ready to discharge; the vessel being at the customary place of discharge for vessels of her burthen.* For any further detention, demurrage at the rate of thirty dollars per day, to be paid daily as the same shall become due; *the vessel to be consigned at Alicant to the consignee of the cargo, who shall be entitled to customary commissions for doing the business of the vessel."*

*"New Orleans, 16th July,* 1829."

(Signed)          AMB. LANFEAR,
                  R. D. SHEPHERD & CO.

The plaintiffs aver a performance of the contract on their part, and that the defendant refused to receive the cargo at Alicant; that he required the ship to proceed to the port of Mahon, and that in consequence of his detention of the ship, and omission to pay the full amount due for her freight, he caused the plaintiffs to suffer damages, amounting in all to eleven thousand five hundred and seventy-one dollars and fifty cents. The general issue was pleaded.

Judgment was rendered in the court below for the plaintiff, for the sum of two thousand seven hundred and thirty-nine dollars and fifty cents, from which, after an ineffectual attempt to obtain a new trial, the defendant appealed.

PORTER, J. delivered the opinion of the court.

SHEPHERD
& CO.
*vs.*
LANFEAR.

The petitioners state that they chartered their vessel called the Shepherdess, to the defendant, to carry a full and entire cargo of tobacco, in hogsheads, from the port of New-Orleans, to Alicant, in Spain, the cargo to be furnished at the levee in the former place, and to be delivered at the latter from the tackles of the vessel, at the charterer's expense. That in pursuance of said agreement, they did receive a cargo of tobacco on board, and carried the same to Alicant, but that the defendant refused to receive the cargo, and in consequence of his refusal, the petitioners were compelled to carry it to Port Mahon, perform quarantine with their vessel, and then reship the tobacco to Alicant.

They aver that the damages they have sustained by this act of the defendant, amount to eleven thousand five hundred and seventy-one dollars and fifty cents, and for which, they pray judgment.

The answer of the defendant, consists of a general denial. The cause was tried by a special jury, who found a verdict in favor of the plaintiffs, for two thousand seven hundred and thirty-nine dollars and fifty cents. An unsuccessful attempt was made to obtain a new trial, and the court below having rendered judgment in conformity with the verdict, the defendant appealed.

The difficulty in this case has grown out of the sanitary laws of Spain. Previous to the arrival of the ship in the port of Alicant, intelligence had been received there, that the yellow fever existed in New-Orleans, and her cargo could not, in consequence of the quarantine regulations of that port, be landed at the usual place of discharge, opposite the city. Orders were given, that the vessel should proceed to Port Mahon, there to undergo quarantine, but permission was given, to land the tobacco at two places adjoining the town of Alicant; namely, Bavil and Albufereda; the latter is distant three miles from the city; the former quite adjacent to it. On this order being issued, the captain offered to deliver the cargo according to the stipulations of the charter party.

The agent of the defendant refused to receive the tobacco at either of these places, alleging that it was not a convenient place of discharge, and as the property would be subject to great and dangerous exposure, at the time of debarkation and afterwards. In consequence of this refusal, the vessel was compelled to proceed to Port Mahon and land her cargo. After the usual delays, it was again taken on board, and finally delivered at Alicant.

Eastern Dis.
*March*, 1833.

SHEPHERD
& co.
*vs.*
LANFEAR.

The case, therefore, turns on the legality of the act of the defendant's agent in refusing to receive the cargo.

But before that question is examined, another presented by a bill of exceptions which appears on record, must be disposed of.

By the terms of the charter party, the consignee of the cargo was entitled to the customary commissions for doing the business of the vessel. It appears to have been a matter of contest in the court below, as it has been the subject of argument here, whether, by this agreement, the factor of the cargo did not become also the agent of the ship, the parties deducing consequences important to their rights on either hypothesis. To sustain the ground assumed by the plaintiffs, that the agent was not to have any control of the vessel, and that the commissions promised, were merely intended as an inducement to the defendant, to enter into the contract of charter party, they offered in evidence the letter of instructions to the captain of the vessel on departing from this port, and the oath of a witness, who was their book-keeper, that they kept regular mercantile books, and that there was not in the letter book, a copy of any letter to the agent of the cargo. This testimony was objected to, but admitted by the judge who tried the cause.

We find it unnecessary to express an opinion on the correctness of the decision of the court below on this point, for if we were to conclude it was erroneous, we should not feel authorized to remand the cause. Admitting the plaintiffs did not consider the agent of the cargo the agent of the ship, we are of opinion that even on the supposition that he was the latter, the defendant is responsible if the same person who was agent

A cause will not be remanded, because evidence has been improperly admitted, if the judgment of the inferior court should be sustained.

EASTERN DIS.
*March,* 1833.

═══════════

SHEPHERD
& CO.
*vs.*
LANFEAR.

of the latter, refused to receive it.  A case cannot be remanded for an error in admitting proof of a fact, when on distinct and different grounds, the legal responsibility of the party to whom the evidence is opposed, is the same, independent of that fact.

It has been contended that *Time Le Vedras,* a merchant in Alicant, to whom the cargo was consigned, was also consignee of the ship, and that, consequently, one of the joint principals cannot be responsible to the other, for the act of their common agent: or that there was such an incompatibility in the authority conferred on him, in case a conflict arose between the interests of the plaintiffs and defendant, that he could not act for either.

We see no reason, whatever, for considering this as a case of joint mandate, unless the circumstance of an agent receiving separate powers in relation to different things from parties having interests which may clash during the agency, can constitute a joint power, which it is clear they do not.  The mandatory in this case was the agent of the plaintiffs for the ship, and of the defendant for the cargo.  The powers were separate; the interests were distinct; the objects were different; and in case this difficulty or a similar one had not occurred, he could have discharged the duties of agent for each with perfect propriety; indeed, the very circumstance of the performance of the agency, producing a direct conflict between the duties which he owed to his respective principals, is conclusive against the idea, that they were his joint mandators.

As to the incompatibility of his obligations in case of an opposition of interests in those he represented, which disabled him from acting for either, we do not perceive much difficulty in the objection.  If it were true, we see no other consequence to result from it, save that the party who was in fault from the want of an agent to act for him, must bear the consequences of such want.  The risk that a conflict of interests might arise, was known to both parties, and if they chose to place themselves in a situation where one might be responsible to the other from not attending either in person, or by an agent, they must make good the consequent damage.  Whe-

ther the non delivery was owing to the improper conduct of an agent who had competent powers, or to the failure to appoint an agent with competent power to act for the defendant, the result would be the same.

EASTERN DIS.
*March*, 1833.

SHEPHERD
& co.
*vs.*
LANFEAR.

But be this as it may, it is clear that the agent in this instance, as in any other of a similar kind, where a conflict of interest arises between the principals from whom he has mandates, may choose to act for one of them. That he acted in this case contradictorily with the captain, who insisted on pursuing the course most advantageous to the ship owners, results we think, manifestly, from the whole of the evidence in the cause. The captain negatives the idea, that any orders were received from him as consignee of the ship, by swearing that he did not act as agent of the ship owners, and his conduct, through the whole transaction, if it required explanation, waives it, in an answer made by him to a request of the captain, after the vessel had returned from Port Mahon, and delivered her cargo. He was called on by the master to assist him in recovering the freight, and he answered, that he could not act as agent for the owners of the vessel, he being agent of the owners of the cargo.

The clause in the charter party, in relation to the delivery of the cargo, reads thus:—" To be received at Alicant from the tackles of the vessel, at the charterer's expense and risk, within twenty-five working days from the time the vessel shall be ready to discharge; the vessel being at the customary place of discharge for vessels of her burthen." The evidence shows that Bavil is not the customary place of discharge for vessels in the port of Alicant, not placed under quarantine, but that it is the customary place of discharge for goods which are considered non-contagious, and which are permitted to be landed from vessels ordered to perform quarantine at Port Mahon or elsewhere, where there is a lazaretto. The question for our decision, is, whether the customary place of discharge mentioned in the charter party, must not be understood to be the place, where, under the circumstances existing at the time, the vessel arrives in port, she is permitted to discharge. *Valin* and *Boulay Paty*, both state, that if the acts of a foreign

EASTERN DIS.
March, 1833.

SHEPHERD
& CO.
vs.
LANFEAR.

power, which regulate and control the place where the freight is to be delivered, present an indefinite obstacle to the per-formance of the charter party, it is dissolved, but that if the obstacle is temporary, the vessel should wait until it is removed, and that in such case, neither shipper nor owner has the right to claim damages for the delay in the non performance. This principle would seem to apply to detention under the quarantine laws as well as any other; and it may, therefore, be assumed, that foreign regulations may delay the perform-ance of the contract. If they have that force, it is difficult to say why they should not have the power to modify the mode of delivering within the port to which the cargo is to be car-ried. If the prohibition to land the cargo had been absolute, both parties according to the doctrine just stated, would have been compelled to bear the consequences, without any claim on each other. When it is conditional, the freighter has not, in our opinion, a right to refuse receiving the cargo, on the ground that he is put to more inconvenience and expense than he would be, if the vessel should perform quarantine and then land it in the usual place. The principle just stated, that both are bound by these laws, must extend to all the limita-tions affixed to them, and it is evident that the doctrine is not established on the ground of a supposed equality in the injury sustained by the detention; for the cases must be frequent where delay alone produces much greater damage to one of the parties to the contract than to the other. Parties are presumed to know the usages and laws of the port where the contract is to be performed, and to contract in reference to them. The mode of delivery depends much on the usage of the place where that delivery is to be made, and if the general laws of the country change the place of delivery in case of quarantine, the freighter is bound to receive it. There is a case in the English books, which is cited by Abbott in illustration of the rule, that the usages and customs of the port of delivery, modify the rights of the parties, or rather govern them under the contract. When ships, says he, arrives from Turkey, and are obliged to perform quarantine before their entry into the port of London, it is usual for the consignee to send down per-

*The acts of a foreign power controling the place where freight is to be de-livered, may mo-dify and delay the performance of a contract of char-ter party.*

*If the foreign prohibition to land a cargo be conditional, the freighter cannot refuse to receive it, on the ground, that by receiving it, he sustains more inconve-nience and ex-pense, than he would sustain if the vessel should perform quaran-tine, and then land it at the usual place.*

*If foreign laws change the place of delivering in case of quaran-tine, the freighter must receive the cargo at the place where the law re-quires.*

EASTERN DIS.
*March*, 1833.

SHEPHERD
& CO.
*vs.*
LANFEAR.

sons at his own expense, to pack and take care of the goods, and, therefore, where a consignee had omitted to do so, and goods were damaged by being sent loose to shore, it was held that he had no right to call upon the master of the ship for a compensation. In this case, it is clear that the usages of the port under the quarantine laws, were considered to impose obligations on the owners of the goods, very different from those which would have arisen from the contract, independent of these laws. *Valin in article* 8 *of ordinnances, titre chartre partie. Boulay Paty, vol.* 2, *p.* 292. *Story's Abbott,* 249.

If we turn from considerations already stated, that quarantine laws are considered to enter into the contract of the parties, and that both are bound by them, and consider this case as one, where the owner of the vessel has been prevented from fulfilling the contract by the government of the country where the cargo is to be carried to, the result would, perhaps, be the same. It has been decided in the United States, that if goods are tendered to the consignee at the port of destination, but the landing of them was prohibited by the government of the country, that the freight was earned. This decision appears to have been made on the authority of the continental writers; and when the interruption is temporary, arising from internal regulation or custom-house restraints, it has been decided in England, that the freighter was answerable for the delay. 4 *Dallas* 455. *Holt on Shipping,* 22.

It has been contended, that the responsibility of the defendant must be limited to the number of days the vessel was detained, and that no higher damages should be given than the amount of demurrage, had she remained in Alicant; but, we are of opinion, that the party can only claim this on the detention of the ship in the port of delivery. Here, in consequence of the refusal of the defendant to receive the cargo, the vessel was compelled to sail for Port Mahon, and was detained there. The risk of this voyage, and the wear and tear of the vessel, were proper considerations of the jury.

The facts of the case in relation to Bavil being the proper place for delivery, were much controverted in the argument. The evidence is contradictory, but after an attentive consid-

EASTERN DIS.
*March,* 1833.

eration of it, we think it decidedly preponderates in favor of the plaintiffs. It is established that Bavil is a place where it is customary to land goods situated as these were; that the goods, with some inconvenience and additional expense, might have been landed there safely, and preserved in safety. On this point, the verdict of the jury has great weight with us.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court, be affirmed with costs.

*Eustis,* for appellant.

*Slidell,* for appellee.